UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DAVID A. COMBE                                          CIVIL ACTION

versus                                                 NO. 06-8909

LIFE INSURANCE COMPANY                                 SECTION: E/3
OF NORTH AMERICA, d/b/a/
CIGNA GROUP INSURANCE

## RULING ON MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on cross motions for summary judgment.  Plaintiff David A. Combe ("Combe") filed a motion for summary judgment on January 31, 2007, (r.d. #5); defendant Life Insurance Company of North America ("CIGNA") filed its motion for summary judgment on February 9, 2007 (r.d. #8).  After due consideration of the briefs, the Administrative Record, and the law, and for the reasons that follow, Combe's motion for summary judgment is GRANTED, and CIGNA's motion for summary judgment is DENIED.

## BACKGROUND

The following facts are undisputed.  Combe was hired by Tulane University Law School in 1972 as Acting Law Librarian.  In 1974 he became Law Librarian and eventually became a tenured faculty member of Tulane Law School in New Orleans, where he worked until December, 2005.[1]  In his position, he had overall responsibility for the operation of the Law Library and

---

[1] See, generally, Complaint.

administration of its staff and facilities, and taught various
law courses to both graduate and postgraduate students in the
Tulane Law School.  Combe was directly responsible to the Dean of
the Tulane Law School, Dean Ponoroff, for the performance of
these duties.

Combe began treatment for depression with Dr. Richard
Roniger in 1992.  Subsequently, he began treating with several
physicians for a weak heart, hypersomnia, sleep apnea and daytime
sleepiness and fatigue in addition to his psychiatric conditions
including depression, anxiety and attention deficit disorder.
His health gradually deteriorated over the years.  He worked at
his job during the 2004 Spring Semester at Tulane Law School, but
last worked teaching a lecture class during Tulane's Summer
School session at Cambridge University, England, in 2004.  He
requested and the Law School granted him a paid sabbatical for
the Fall Semester of 2004.  In late 2004, Combe's cardiologist,
Dr. Lawrence O'Meallie, referred him to surgical cardiologist Dr.
James D. McKinnie for treatment of Combe's dilated cardiomyopathy
and ventricular tachycardia.  In November of that year Drs.
McKinnie and John Pigott inserted an AICD device, which
stabilized Combe's heart condition.  (AR 524-527, 506-507.)

Nevertheless, Combe was unable to return to work on January
1, 2005, as anticipated.  Hoping to regain his health and return
to work at a later date, Combe requested and Dean Ponoroff

granted a paid medical leave of absence from January 1, 2005 until December 1, 2005.  His employment was terminated when he was still unable to return to work on December 1, 2005, however, he was paid his salary through December 31, 2005.[2]  The termination of his active employment for Policy purposes was December 31, 2005.

Having concluded by the late summer of 2005 that, at age 62, he would be unable to return to work due to his multiple medical conditions, Combe decided to apply for long term disability benefits.  During his employment, he was a participant in the Tulane Long Term Disability Plan.[3]  The Plan was fully insured by CIGNA under Group Insurance Policy No. LK-030566 issued to Tulane University.  (AR 203-228.)[4]  The Plan and Policy provide the appropriate language granting to CIGNA full fiduciary status and authority to determine benefit claims.

Combe filed his claim for LTD benefits on October 28, 2005.[5] (AR 4-13).  He identified September 1, 2005 as the approximate

---

[2]At this time Tulane was not open, having been closed by Hurricane Katrina and the subsequent flooding.

[3]Participation in the plan was mandatory for plaintiff's class of employees, and 100% of the premiums were deducted from his salary.

[4]References to the Administrative Record will be used throughout this Ruling.  A copy of the Certificate of Insurance and the Plan is also attached to Combe's Motion as Exhibit "A".  The Plan and the Policy are identical, and references hereinafter will be to the Policy itself.

[5]The filing date was delayed by Hurricane Katrina, which caused the evacuation of Combe, his lawyer, doctors, Tulane's faculty and staff, and virtually all of the residents of New Orleans.  By October 28, 2005, Combe and his lawyer had returned to the city, but his doctors had not.

date on which he ultimately became disabled, and September 1, 2004, as the approximate date of the onset of his disabling condition.[6]  Combe furnished various additional information initially requested by CIGNA (AR 16-64), including Attending Physician's Statement of Disability ("APS") by Combe's treating physicians, Dr. Richard Roniger (psychiatrist), Dr. Houman Dahi (sleep specialist), Dr. Blackwell Evans (gatekeeper/general practitioner), and Dr. O'Meallie (cardiologist) (respectively AR 30, 36, 40, and 61).

Combe's claim was initially denied on February 9, 2006, under the signature of Amy King, CIGNA Claims Manager (AR 75-80). On February 17, 2006, (AR 81-85), Combe requested that CIGNA produce information and documentation in aid of his intent to submit an intra-plan appeal of the denial (AR 81-85).  CIGNA timely produced most of the requested information (AR 86-467).

---

[6]CIGNA's records reflect various inconsistent and contradictory dates assigned as Combe's last date of work and onset of his disability, and various dates of and reasons for his paid leave for the time period from fall 2004 through the last date he was paid by Tulane, December 31, 2005.  It cites to "Tulane's employment records", which are also internally inconsistent, incorrect and actually contradictory.  In its initial denial, the administrator stated Combe "filed for a non-medical sabbatical on 12/31/04 and were [sic] accepted for medical Leave of Absence on 10/31/05 ..."  These dates are inconsistent with the information in the Administrative Record. They appear to be based upon information provided by email to Amy King by someone in the Tulane employment records office, stating that his last day "with the university" was 12/31/04, and which also contained a hand written note (no indication by whom) stating "non medical sabbatical 12/31/04" and "LOA date 10/31/05".  AR 494.  Similarly, a Tulane University LTD Employee Intake Form states that his "Last Day Worked" was 8/26/05.  None of these dates is accurate.  The 8/26/05 date is the Friday before Hurricane Katrina struck and closed Tulane (and the city) for several months, or possibly the last date of Tulane's Summer Session. The court accepts as uncontroverted the dates and types of paid leave he received from Tulane as set out by Combe in his Affidavit, and in his Application.

On June 26, 2006, Combe filed his Appeal with his attached Affidavit and Exhibits A through T.  When no response was received by July 11, 2006, Combe faxed a request for acknowledgment that the Appeal had been received (AR 658-660), including a copy of the UPS Delivery Notification confirming delivery on June 27, 2006.  Again no response was received.  On September 7, 2006, by letter, with a copy served on CIGNA's Agent for Service of Process, the Secretary of State for the State of Louisiana, Combe notified CIGNA that it's response to his Appeal had been due on August 12, 2006, and was overdue according to its own Policy, the information contained in its Denial, and applicable regulatory law (AR 661-663).

Another week passed.  Finally, in a flurry of faxes and telephone calls between CIGNA administrators and Combe's counsel (AR 668-678), on September 14, 2006, CIGNA acknowledged receipt of Combe's Appeal without explanation for the lengthy delay, and agreed to conduct a full medical review of Combe's file, with a decision on his Appeal forthcoming by September 30, 2006.  The decision on Combe's Appeal, rendered by Gary Person, Manager Centralized Appeal Team, and dated September 29, 2006, affirmed the initial denial of Combe's claim.  AR 680-681.  On October 23, 2006, Combe filed suit against CIGNA alleging that CIGNA wrongfully denied his claim for long term disability ("LTD") benefits under Tulane's Plan.  These cross motions for summary

judgment followed.

## ANALYSIS

A motion for summary judgment is properly granted only if there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L. Ed. 3d 265 (1986). An issue is material if its resolution could affect the outcome of the action. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). In deciding whether a fact issue has been created, we must view the facts and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. See Olabisiomotosho v. City of Houston, 185 F.3d 521, 525 (5th Cir. 1999). However, once a moving party properly supports a motion for summary judgment, the nonmoving party "must go beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial." Lawrence v. Univ. of Tex. Med. Branch at Galveston, 163 F.3d 309, 311-12 (5th Cir. 1999), quoting Wallace v. Texas Tech. Univ., 80 F.3d 1042, 1047-48 (5th Cir. 1996). The nonmoving party cannot satisfy its burden with "unsubstantiated assertions" or "conclusory allegations." Id. If the opposing party bears the burden of proof at trial, the moving party need not submit evidentiary documents to properly support its motion, but need only point out

the absence of evidence supporting the essential elements of the opposing party's case. <u>Saunders v. Michelin Tire Corp.</u>, 942 F.2d 299, 301 (5th Cir. 1999).

<em><u>ERISA Standards of Review</u></em>

This is an ERISA case brought pursuant to 29 U.S.C. § 1132(a)(1)(B). A denial of benefits challenged under the provisions of ERISA must be reviewed under a *de novo* standard unless the benefit plan gives the plan administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the plan, in which case the standard of review is abuse of discretion. <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 105, 109 S.Ct. 948 (1989). It is undisputed that the policy at issue vests CIGNA with the discretionary authority to determine eligibility for benefits and to interpret the terms and provisions of its policy in making benefit determinations, therefore the court will review CIGNA's denial of Combe's claim for abuse of discretion.

The scope of the district court's review in assessing CIGNA's factual determination to deny benefits is limited to a review of the administrative record. <u>Vega v. National Life Insurance Services</u>, 188 F.3d 287, 299 (5th Cir. 1999). "The administrative record consists of relevant information made available to the administrator prior to the complainant's filing of a lawsuit and in a manner that gives the administrator a fair

opportunity to consider it." Id., at 300; Estate of Bratton v. Nat'l Union Fire Ins., 215 F.3d 516, 521 (5th Cir. 2000). Therefore:

> a district court must inquire only whether the "record adequately supports the administrator's decision"; from that inquiry it can conclude that the administrator abused its discretion if the administrator denied the claim "without some concrete evidence in the administrative record."

Gooden v. Provident Life & Accident Ins. Co., 250 F.3d 329, 333 (5th Cir. 2001).

The decision whether a plan beneficiary is disabled as defined by an ERISA plan is a factual determination subject to judicial review under an arbitrary and capricious standard. Sweatman v. Commercial Union Ins. Co., 39 F.3d 594, 601 (5th Cir. 1994); Bass v. Metropolitan Life Ins. Co., 1995 WL 581761 (E.D.La.). Factual determinations made by an administrator should be rejected only upon a showing of an abuse of discretion, that is, if shown to be arbitrary and capricious. Pierre v. Connecticut General Life Insurance Co., 932, F.2d 1552, 1562 (5th Cir. 1991). A decision is arbitrary when it is made without rational connection between the known facts and the decision or between the found facts and the evidence. Lain v. Union Life, 279 F.3d 337, 346 (5th Cir. 2002). However, a decision of a plan administrator or fiduciary should not be overturned if the decision is supported by substantial evidence. Wildbur v. Arco

Chemical Co., 974 F.2d 631, 637 (5th Cir. 1992)(citations omitted), *reaff'd  by* Medtrust fin. Serv. Corp. v. The Sterling Chemicals, Inc., 168 F.3d 211, 215 (5th Cir. 1999).  Substantial evidence is "such evidence that a reasonable mind might accept as adequate to support the conclusion rendered by the decision maker.  Substantial evidence requires more than a scintilla, but less than a preponderance." Ellis v. Liberty Life Ins. Co. Of Boston, 394 F.3d 262, 273 (5th Cir. 2005).

## *Level of Deference Accorded to the Administrator's Decision*

Citing  Gooden, Combe argues that where an employer contracts with a third party that both insures and administers the benefit plan, as in this case, the administrator of the plan has an inherent conflict of interest which must be weighed as a factor in determining whether there was an abuse of discretion.  CIGNA argues that its decision denying Combe's claim for LTD benefits should be reviewed with only a modicum of less deference as a result of the conflict of interest.  It argues that there is no evidence of any conflict of interest other than the fact that it is both the insurer and the administrator of the Plan.

The Fifth Circuit has recognized that some modification of the abuse of discretion standard may be required in such a situation where the insurer could potentially benefit from the denial of a claim.  Vega, 188 F.3d at 295.  However, the Fifth

Circuit does not recognize the *presumption* that such a conflict exist, and requires that an "ERISA plaintiff must come forward with evidence that a conflict exists - and that any reduction in the degree of our deference depends on such evidence - ...." Ellis, 394 F.3d at 270 n.18, *citing* MacLachlan v. ExxonMobil Corp., 350 F.3d 472, 479 n.8 (5th Cir. 2003).  The degree to which a court must abrogate its deference to the determination of a plan fiduciary will depend on the nature and extent of the fiduciary's conflict, with less deference to be granted when there is greater evidence of a conflict.  Id.

Several circumstances can be indicative of a conflict.  For example, where, in the exercise of its discretion in processing a claim, one interpretation will further the financial interests of the fiduciary, the court should review the interpretation to determine whether it is consistent with the exercise of discretion by a fiduciary acting free of interests that conflict with those of the beneficiary.  Vega, 188 F.3d at 295.   A conflict of interest is also shown if the plan administrator provides inconsistent reasons for denial of a claim.  Lang v. Long-Term Disability Plan of Sponsor Applied Remote Tech, 125 F.3d 794, 797 (9th Cir. 1997).

Given the myriad of failures to comply with the applicable regulations and the absence of factual support in the record for its denial of Combe's application for LTD benefits, see

discussion *infra*, CIGNA is entitled to a bare minimum of deference in the Court's determination of whether it abused its discretion in this matter.

<u>*Abuse of Discretion Analysis*</u>

In the Fifth Circuit, application of the abuse of discretion standard may involve the following two steps: (1) determine the legally correct interpretation of the plan; the (2) if the administrator did not give the plan the legally correct interpretation, the court must then determine whether the administrator's decision was an abuse of discretion.  <u>Wildbur</u>, 974 F.2d at 637-638.  Answering the first question requires consideration of (1) whether the administrator has given the plan a uniform construction; (2) whether the interpretation is consistent with a fair reading of the plan; and (3) any unanticipated costs resulting from different interpretations of the plan.  <u>Id.</u> at 638.  If the court finds that the administrator's interpretation of the plan is not correct, several factors may be reviewed to determine whether the administrator abused its discretion: (1) the internal consistency of the plan under the administrator's interpretation; (2) any relevant Regulations formulated by the appropriate administrative agencies; (3) the factual background of the determination; and (4) any inferences of lack of good faith.  <u>Id.</u>; <u>Lain v. Union Life</u>, 279 F.3d 337, 346 (5th Cir. 2002).

<u>Did the Administrator give the Legally
Correct Interpretation of the Plan Documents?</u>

The Plan documents at issue here define Disability/Disabled[5]

as follows:

> The Employee is considered Disabled if,
> solely because of Injury or Sickness, he or
> she is either:
> 1) unable to perform all the material duties
> of his or her Regular Occupation or a
> Qualified Alternative; or
> 2) unable to earn 80% or more of his or her
> Indexed Covered Earnings.

AR 209.  They define Regular Occupation[3] as follows:

> The occupation you routinely perform at the
> time the Disability begins.  In evaluating
> the Disability, we will consider the duties
> of the occupation as it is normally performed
> in the general labor market in the national
> economy.

AR 225.  The Plan therefore expressly provides that the

administrator will consider the duties of the claimant's

occupation in evaluating that claimant's disability.

Addressing the first of the <u>Wildbur</u> factors, the Court is

unable to determine whether the administrator has given the plan

a uniform construction because there is nothing in the

Administrative Record to allow the Court to compare the

administrator's evaluation of Combe's claim with its evaluation

of other similar claims.  Neither is there anything in the

---

[5]See also Plaintiff's Memorandum in Support of Motion for Summary
Judgment, Ex. "A", copy of the Group Insurance Plan, at p. 13.

[3]<u>Id.</u> at p. 16.

Administrative Record to allow the Court to address the third
Wildbur factor, whether there may be any unanticipated costs
resulting from different interpretations of the plan.  CIGNA did
not argue or produce any documents regarding whether a different
determination of Combe's application for LTD benefits under the
Plan would have any consequences or effect, unanticipated or
otherwise, on the Plan.

There is sufficient evidence in the Administrative Record to
address the second Wildbur factor, determining whether the
interpretation is consistent with a fair reading of the plan.
The administrator's reasons for the initial denial of Combe's
application for LTD benefits are explained as follows:

> Your client's file was reviewed by our Nurse
> Case Manager who confirmed  that the medical
> information on file does not indicate what
> changed in his condition as of 10/31/2005,
> when he filed for medical leave of absence,
> that prevents him from working in his
> occupation.  The last cardiac functioning was
> performed 09/21/04 and 10/15/04 and Mr. Combe
> had a defibrillator placement on 11/22/04.
> As of that date we have *no testing showing
> that this is not working satisfactorily*.  The
> last information on file regarding this is a
> statement from Dr. O'Meallie dated 10/28/05
> showing your client's blood pressure as
> 117/70 but no cardiac restrictions were given
> *nor was testing provided*. The information
> from Dr. Dahi shows that he was treated for
> obstructive sleep apnea first with a CPAP on
> 09/27/04 and with a BiPAP on 01/05/05.  Dr.
> Dahi states that your client's physical
> disability is mainly related to his heart
> problems and Dr. O'Meallie states that he is
> unable to drive due to your sleep disorder.

-13-

Jeff at Dr. McKinnie's office states that
there is no information at their office
showing why Mr. Combe cannot perform his
occupation as a law professor.  Dr. Roniger
states that he has treated your client for
depression and attention deficit disorder
since 1992, his records show that your client
is on the same medication and we do not
understand what changed in your client's
condition as of 10/31/05 that prevents him
from working due to either of these
conditions.  Dr. Roniger provides treatment
dates of 06/30/05 and 11/02/05 but these do
not show a change in your client's condition,
treatment, or *testing that would substantiate
a change in your client's ability to work as
of 10/31/05.*

                    ****

Although we understand that Mr. Combe may
have Neuropsychiatric problems, sleep apnea,
and congestive heart failure with implanted
defibrillator, *we do not have testing showing
neuropsychiatric problems*.  Your client's
sleep apnea is controlled with BiPAP usage
according to the last information from Dr.
Dahi, and your client has had *no testing
showing abnormal defibrillator* results since
it was implanted on 11/22/04.  In order to
meet the definition of Disability as defined
above *we must understand how the
diagnosis/diagnoses prevent your client's
ability to work at his occupation.  We have
no testing showing his inability to perform
the light duty tasks of his occupation.*

AR 078-079 (emphasis supplied).  These two paragraphs summarize

the administrator's evaluation of Combe's medical records and its

interpretation of the Plan.  It states an incorrect date for

Combe's application for a medical leave of absence, and

incorrectly assigns 10/31/2005 as the "incur" date of Combe's

disability.  Additionally, while mentioning the treating

physician's diagnoses of Combe's congestive heart failure with
implanted defibrillator, obstructive sleep apnea, and
neuropsychiatric problems of depression and attention deficit
disorder, there are six references in the two paragraphs citing a
lack of testing to support those opinions.  It mentions Combe's
occupation only in passing as follows:

> Tulane University describes Mr. Combe's job
> duties as teaching academic courses,
> conducting research, and publishing.
> According to our records, he is a Law
> Librarian, Faculty Member, and Teacher of Law
> School Courses.  Your client's occupation is
> considered light physical duty.

AR 076.[4]  Its evaluation of Combe's disability makes no other
mention of his job description or duties, other than to simply
state that "[w]e have no testing showing his inability to perform
the light duty tasks of his occupation." (AR 079).

In his letter affirming the administrator's initial denial
on appeal, Gary Person, identified as Manager Centralized Appeal
Team, explained as follows:

> In the medical review the medical directors opinioned
> [sic] as to the physical issues:

>> The cardiologist indicated Left Ventricular
>> function of about 30-32% but the actual study
>> showed EF at 40%.  The cardiologist did state
>> that from cardiac standpoint the CX
>> (claimant) was doing well and his symptoms

---

[4]This conclusion appears to be based on an email from someone named
Sandy West at Tulane regarding new claims, which states "Both Comb [sic] []
are faculty members and we don't have their JD's.  Faculty typically teach
academic courses, conduct research and publish."  AR 385.

are negligible.....Based on available medical
documentation and *lack of available mini
mental or cognitive tests*, the medical
records do not document that the CX's medical
condition, mental or physical, have deficits
to support the R&L's [sic] (restrictions and
limitations) given by his cardiologist.

The conclusion of the psychiatric review was; "In its
entirety, the review of available information does not
support a psychiatric functional impairment to preclude
the claimant from work capacity."  This was based on a
finding that the symptoms were similar during the
entire course of treatment for psychiatric conditions;
that the notes are not consistent with severe major
depressions signs and symptoms.  They do not support
significant cognitive impairment, and *there has not
been any cognitive neuropsychological testing, such as
abnormal mini-mental status examination or
neuropsychological testing.*

AR 681 (emphasis supplied).  Person's two page explanation of

CIGNA's denial of Combe's Appeal twice refers to a lack of

testing supporting the treating physicians' diagnoses, and does

not even mention Combe's obstructive sleep apnea, one of the two

medical conditions cited in Combe's application for LTD benefits

as the basis for his claimed disability.[5]  AR 005, 007.  Neither

does it discuss the duties of Combe's regular occupation.

    The Administrative Record includes at least three

uncontradicted detailed descriptions of Combe's Regular

Occupation as referred to in the Plan, plus a reference in

CIGNA's internal documents, at AR 171, apparently from an

_____

[5]At AR 007, question 2 of the Disability Questionnaire asks: "What is
the primary physical and/or mental condition preventing you from working now?"
Combe's response was "Sleep Apnea aggravated by cardiomyopthy."

interview with the claimant, that "both librarian and teaching affected by memory and tiredness."  During the initial evaluation of Combe's application for LTD benefits, the Administrative Record included a copy of a "Social Security Status Update" sent to Amy King from Allsup, Inc., Social Security Innovations, in December 2005.  AR 381.  The document identifies Combe's job as follows:

> 090.227-010  Faculty Member, College or University
> O*NET SOC Code: 25-1011.00 Business Teachers, Postsecondary

AR 382-383.  It describes the duties and demands of the job in detail, including briefly: teaches one or more subjects; prepares and delivers lectures to students; compiles, administers and grades examinations; compiles bibliographies of specialized materials; stimulates classroom discussions; directs research of other teachers and graduate students; conducts research in a particular field of knowledge.  The document includes an indication of an advanced level of vocational preparation and educational development, but light duty physical demands.  Work situations are described as directing, controlling or planning activities of others; dealing with people in complex situations; influencing others' attitudes, opinions and judgments; and making judgments and decisions.  This description was available to Amy King during her initial evaluation of Combe's application for LTD benefits.

Combe's Appeal included the following additional information regarding the material duties of Combe's regular occupation.  At Ex. "A" to Combe's Appeal (AR  492-493), is the job description for the position of Law Librarian provided by Tulane Law School. The description is one and a half pages of single spaced detail describing, *inter alia*, the administrative duties, the technical library duties, and the supervisory duties of the Law Librarian. These duties as described in detail are intellectually complex, challenging and demanding, requiring close attention to detail, focus, alertness, physical stamina, and problem solving skills. Also attached to the Appeal is Combe's uncontroverted Affidavit (AR 650-657) which also describes the intellectual rigors and physical demands of his job duties in detail.  See, especially, paragraphs 7 through 10, Affidavit pp. 2-3, AR 651-652.

The letter denying Combe's Appeal addresses Combe's occupation in the following sentence:

> Based on a complete review of the file and the input of our Medical Directors, the prior adverse claim determination is affirmed by this letter as limitations and restrictions of functionality that prohibit your client from performing his regular occupation [sic][6]

There is no mention that the Medical Directors who reviewed Combe's Appeal, or for that matter, Mr. Person, actually reviewed

---

[6]There is no period at the end of the sentence, and as it is, the sentence makes no sense.  The Court assumes that a final phrase, such as "have not been shown" was omitted.

the additional information regarding the material duties of Combe's regular occupation that was available in the Administrative Record at that time.  There is no indication in the 1000+ page Administrative Record that any administrator at CIGNA gave a thought to the actual duties, the intellectual demands or the physical endurance, required by Combe's occupation, although evidence of those demands was readily apparent in the Administrative Record.

There is evidence in the Administrative Record of Combe's physical and psychiatric medical conditions including sleep apnea, daytime sleepiness and chronic fatigue, attention deficit disorder, lack of motivation and focus, major depression and serious heart problems exacerbated by stress.[7]  Apparently, in CIGNA'a view, as long as Combe's job duties did not require him to operate heavy equipment, work on an off-shore oil platform, drive a vehicle or physically endanger others, it should be perfectly acceptable for him to sleep on the job, or when awake, to be fatigued, unable to read and comprehend a short legal article, unable to focus on an issue, and unable to interact with or supervise others during his normal work day.

The Court finds that the administrator failed to consider the material duties of Combe's Regular Occupation or a Qualified

---

[7]See the analysis of the factual basis of the administrator's decision *infra*.

Alternative when it found that he was not Disabled under the Plan.  Neither did the administrator explain where in the Plan documents, statutory or regulatory language, or jurisprudence, there is language requiring the claimant to submit to a specific test or testing in order to objectively prove a claimed disability that has been diagnosed by a treating physician and supported with the physician's office notes, examinations and testing.  Neither is there any language requiring a claimant to "incur" the claimed disability on a specific date.  CIGNA did not give the Plan the legally correct interpretation in evaluating Combe's claimed disability.

<u>Did the Administrator Abuse its Discretion?</u>

Having answered the first question in the abuse of discretion analysis in the affirmative, the Court must now determine whether the administrator abused its discretion when it failed to give the Plan the legally correct interpretation.  When an administrator's interpretation of a plan is in direct conflict with express language in a plan, although not dispositive, it is "a very strong indication of arbitrary and capricious behavior." <u>Wildbur</u>, 974 F.2d at 368, *citing* <u>Batchelor v. Internat'l Brotherhood of Electrical Workers Local 861 Pension & Retirement Fund</u>, 887 F.2d 441, 445-8 (5th Cir. 1989) *quoting* <u>Dennard v. Richards Group, Inc.</u>, 681 F.2d 306, 314 (5th Cir. 1982).

-20-

1.   The internal consistency of the plan under the
     administrator's interpretation.

CIGNA produced no copies of internal written procedures or protocols to guide the administrator's evaluation of whether a claimant can perform the duties of his or her Regular Occupation, so the Court cannot review the internal consistency of the administrator's evaluation of Combe's claim in light of internal procedures or protocols.[8]  Neither the Plan documents nor the Administrative Record reflect that the Plan adopted any administrative procedures and safeguards designed to ensure that the administrator's determination of a claim for benefits is made in accordance with the Plan's provisions.  The Court cannot determine whether the administrator's interpretation of the Plan in this instance was internally consistent with required procedures, protocols or safeguards.

2.   Relevant Regulations formulated by the appropriate
     administrative agencies.

In <u>Robinson v. Aetna Life Ins. Co.</u>, 443 F.3d 389, 394 (5th Cir. 2006), the Fifth Circuit held that two procedural violations of applicable Regulations issued under ERISA is equivalent to a lack of compliance, resulting in a failure to provide a full and

---

[8]In a letter to CIGNA dated February 17, 2006, after receipt of CIGNA's denial of Combe's LTD benefit claim, Combe's counsel requested copies of any documents demonstrating compliance with the administrative process and safeguards required pursuant to these procedures, or any statements of policy or guidance with respect to the Plan concerning the claimant's diagnosis.  AR 081-084, particularly items (3) and (6), AR 082.  See also letter of October 10, 2006 (AR 684-686). None were produced by CIGNA.

fair review of a claim and a finding of abuse of discretion.  The
Department of Labor's Pension and Welfare Benefits Administration
("PWBA") issued a final Claims and Appeals Regulation ("C&A
Reg."), Fed. Reg. Vol. 65, No. 225 (November 21, 2000), that is
applicable to all group health benefit and disability claims
filed on or after January 1, 2002 under plans governed by ERISA.
Generally[9], the C&A Reg. establishes maximum time periods for
acting on claims and appeals as well as basic criteria to meet
its requirement that plans must establish reasonable claims
procedures and provide full and fair review of adverse benefit
determinations.

For example, in the event of an adverse disability
determination involving a medical judgment, the decision on
appeal must issue no later than 45 days from receipt of the
appeal.  Moreover, the fiduciary decision maker must consult with
a health care professional who has appropriate training and
experience in the pertinent field of medicine, and the claim on
Appeal must be decided *de novo* on the record as a whole with no
deference to the initial adverse decision, and independently of
the fiduciary who made the original decision.  See also, DOL PWBA
Press Release ("Guidance") of December 17, 2001, re C&A Reg.
Procedures must be in place, and must be followed, to ensure that

---

[9]See Combe's memorandum in support of motion for summary judgment, pp.
31-33, for a more detailed recitation of the content of the applicable
regulations.

a claimant appealing an adverse decision is accorded a full and fair review.

Combe's application for LTD benefits, and CIGNA's response and investigation of Combe's claim, were seriously impacted by the devastating effects of Hurricane Katrina.[10]  During those months in late 2005 and early 2006, the telephone service and U.S. mail service were spotty, unreliable, and in many cases, non-existent in many areas.[11]  Thousands of homes, offices and businesses sat under water for weeks and many records that had been lost in the flood had to be painstakingly reconstructed, if possible at all.  In short, much of New Orleans' infrastructure was in shambles.  The majority of the New Orleans population, including Combe's doctors, lawyer, Tulane faculty and administration, and Combe himself, had evacuated (the evacuation was mandatory) and many had not yet returned to the city from their places of exile.

Neither CIGNA's memorandum in support of its motion for summary judgment nor its opposition to Combe's motion for summary

---

[10]For disability claims, the administrator is initially allowed 45 days to review and decide a claim, but a plan is allowed two extensions of time for 30 additional calendar days each.  The administrator decided Combe's initial claim in 104 days.

[11]The Administrative Record documents CIGNA's difficulty in contacting Combe's doctors and collecting medical records with a litany of references to unanswered calls, wrong numbers, disconnected numbers, constant busy signals, and messages left for return calls.  AR 106-167.  Apparently CIGNA chose no to avail itself of the available assistance of Combe's counsel and Designated Representative.

judgment mention its failure to respond to Combe's Appeal within
the allotted 45 days.   Because Combe filed his Appeal on June
26, 2006, CIGNA's response was due on August 12, 2006.   CIGNA did
not even acknowledge receipt of Combe's Appeal until September
14th.   By then, it was long overdue, 33 days past the date the
due date.   Rather than having the 45 days to properly evaluate
the appeal as required by the regulations, CIGNA's evaluation was
hastily and superficially conducted in 14 days.

The Court has already noted that CIGNA has produced no
evidence of any procedures or protocols to ensure that a claimant
appealing an adverse decision is accorded a full and fair review.
According to the initial letter of denial signed by Amy King,
Combe's medical records were initially reviewed by a "Nurse Case
Manager" ("NCM") who was identified in the Administrative Record
as Teresa Lynfoot.  AR 078.  There is no indication of what her
experience or medical expertise is.  During the initial review of
Combe's claim the NCM and the fiduciary decision maker
inappropriately relied on a the opinion of Jeff Andrews,
identified as Dr. McKinney's nurse, to support its determination
that Combe was not disabled.  See AR 111, for text of the NCM's
conversation with Jeff Andrews regarding Combe's medical
condition, his limitations and restrictions, job description, and
ability to return to work.

The Medical Directors who reviewed Combe's medical records

on Appeal are identified as Dr. Hatam, whose area of expertise or specialty is not provided, and Dr. Unsell, identified as a Diplomate, American Board of Psychiatry and Neurology.  AR 781. There is no indication that the medical records were evaluated on Appeal by a cardiologist or a specialist in sleep apnea. There is no indication that the claim on Appeal was be decided *de novo* on the record as a whole with no deference to the initial adverse decision, independently of the fiduciary who made the original decision.  These are not mere technical procedural violations, but a substantial failure to comply with the applicable standards.  See <u>Robinson</u>, <u>id.</u>

3.   The factual background of the determination

     In <u>Booton v. Lockheed Medical Benefits Plan</u>, 110 F.3d 1461 (9th Cir. 1997), the Court held that it was an abuse of discretion for an administrator to rely on a lack of information, and if the plan was unable to make a rational decision on the basis of the materials submitted by the claimant, it must explain what it needs and then obtain the information.  <u>Id.</u> at 1464.  The Fifth Circuit also instructs that it is arbitrary and capricious to extract and approve of only one part of a diagnosis from a treating physician to support a claim denial, while at the same time rejecting that part of a diagnosis that supports a claim of disability.  <u>Salley v. E. I. Dupont de Nemours & Co.</u>, 966 F.2d at 1015-1016.  "The Plan administrators may rely on the treating

physician's advise, or it can independently investigate the treatment's medical necessity." Id. at 1015.  The Supreme Court has also cautioned that "Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of the treating physicians."  Black & Decker Disability Plan v. Nord, 123 S.Ct. 1965, 1972 (2003).

Following is a brief recitation of the reports, notes, and diagnoses of Combe's various treating physicians, and the review of those medical records provided by the NCM and administrator in the initial denial of Combe's claim, as well as the review on Appeal provided by Medical Directors Dr. Marie Hatam and Dr. Randall Unsell.

**Dr. Lawrence O'Meallie, treating cardiologist:**

Dr. O'Meallie furnished notes covering the period from August 2004 through March 2005, regarding Combe's heart problems. He personally treated Combe since January 1, 2005.  He furnished a APS requested by CIGNA, on which he certified that Combe was "indefinitely permanently" unable to return to work.  The form was not dated but refers to a blood pressure reading dated 10/28/05, and was provided to CIGNA on December 28, 2005.  AR 60-64.  His office notes dated May 25, 2005, reflect his discussions with Combe's other treating physicians regarding the difficulties in managing the drug therapies they are jointly administering, and documents Combe's chronic fatigue, restless

-26-

leg syndrome, sleep disorder, hypertension, preoccupation, anxiety and short-term memory deficiency.  AR 512-513.

In its initial denial of Combe's claim, the administrator stated: "... your client has had no testing showing abnormal defibrillator results since it was implanted on 11/22/04."  In a report dated March 22, 2006, in response to Combe's counsel's request for information regarding this interpretation of Dr. O'Meallie's records, Dr. O'Meallie explained that the fact that Combe's defibrillator is functioning and has had no discharges does not mean that Combe's cardiac condition is not disabling. It simply means that if Combe experiences an episode of ventricular tach or Vfib, as he has in the past, the defibrillator charge will terminate the episode.  AR 506-507.

In Dr. Hatam's appellate review of the medical records, which consists of two pages, she notes the results of the last cardiac testing performed on March 22, 2006, Dr. O'Meallie's comment that from a cardiac standpoint Combe is doing well and his symptoms are negligible, and that according to office notes dated October 28, 2005, Combe was stable enough not to return for 6 months.  From these observations she determined that "[b]ased on available medical documentation and lack of available mini mental or cognitive tests, the medical records do not document that the CX's medical condition, mental or physical, have deficits to support the R&Ls given by his cardiologist."  AR 789.

-27-

**Dr. James McKinnie, cardiac surgeon**:

When the administrator contacted Dr. O'Meallie's office on January 20, 2006, for a cardiac function, Dr. O'Meallie's nurse referred her to Dr. McKinnie for that information.  On January 26, 2006, the NCM received a return call Dr. McKinnie's office and, apparently unable to speak to Dr. McKinnie, spoke to Jeff Andrews, identified as Dr. McKinnie's nurse and referred to in the administrator's initial letter of denial as "Jeff".  Even after Jeff stated that he had no records relating to Combe, the NCM interviewed him regarding Combe's medical condition.  Jeff informed the NCM that the defibrillator was "okay" the last time it was checked, but that they did not have a current ejection fraction test or last visit date.  The NCM then proceeded to ask whether Combe's cardiac status would allow him to return to work, and "explained" that Combe was a law professor.  Jeff then opined that "he just couldn't be in a high risk environment such as an offshore oil man."  When told by the NCM that Combe's job "is considered a light duty occupation", Jeff stated that there should be no problem.  AR 078.  The administrator expressly relied on this information in its denial of Combe's claim.

By letter dated June 7, 2006, to Combe's counsel, Dr. McKinnie stated that Combe had "severe dilated cardiomyopathy and is status post insertion of an automatic implantable defibrillator."  AR 554.  He further opined that, given Combe's

overall cardiac status, "he is disabled and unable to perform the duties required of him, particularly due to added stress which may impact his cardiac condition." Id.  On June 9, 2006, Dr. McKinnie completed an APS stating that Combe's diagnosis is ventricular tachycardia; his subjective symptom was "risk of sudden cardiac death"; that he is physically limited to lifting, carrying, pushing or pulling 10 pounds (sedentary level of ability); that the extent of his disability was "permanent disability"; and finally, that he was not a candidate for further physical/ psychological rehabilitative services and that his present job could not be modified to allow for handling with impairment.  (AR 555-556).  This document was attached to Combe's Appeal at Ex. K.

There is no indication in the letter denying Combe's Appeal that the report, diagnosis and opinion from Dr. McKinney was considered on Appeal, nor is there any mention of this information in Dr. Hatam's or Dr. Unsell's reports of their full review of Combe's medical records on appeal.  AR 788-789, 784-786.

**Dr. Houman Dahi, adult sleep specialist:**

Dr. Dahi completed an APS dated 12/5/05, showing that Combe had been treated for obstructive sleep apnea and hyposomnia since August 2000, that he has been unable to work since September 1, 2004, and observed "Patient with excessive sleepiness, may only

work not put him or other people in danger.  Patient physical
disability is mainly related to his heart failure."  AR 036-039.
His records include a report of an Overnight Sleep Study on
January 25, 2005, and "progress note" from an office visit on
January 21, 2005.  AR 042-044.  Included in the document is the
statement, at "Therapeutic Impression", "Obstructive sleep apnea
and hypopnea syndrome, controlled with BiPAP at pressure of
14/7."  AR 043.

In the initial letter of denial, the administrator states
that Combe's "sleep apnea is controlled with BiPAP usage
according to the last information from Dr. Dahi", presumably
relying on the reference in Dr. Dahi's "progress note" from an
office visit on January 21, 2005, and that according to Dr. Dahi,
Combe's disability is "mainly related to his heart failure".  AR
078-079.

Dr. Dahi provided a letter to Combe's counsel dated April
28, 2006, attached to Combe's Appeal at Ex. M (AR 563-564) which
indicated that due to damage suffered by the Tulane University
Hospital from Hurricane Katrina, the sleep clinic operation was
not functioning until March 2006.  He stated that Combe suffers
from excessive daytime sleepiness and obstructive sleep apnea.
He further stated that Combe had been receiving BIPAP therapy to
control his obstructive sleep apnea, but that despite adequate
therapy and good compliance with his therapy, he remains

excessively sleepy.  The report noted that "He scored 18 on Epworth Sleepiness Scale, indicating severe daytime sleepiness." (AR 565-566).  His driving was restricted to before 2:00 p.m., and only for five mile distances with significant rest after that distance.  His opinion is supported by a Multiple Sleep Latency Test on April 22, 2005, following an overnight sleep study on April 21, 2005, revealing that despite adequate control of his obstructive sleep apnea, he had "severe pathological sleepiness" during the day.  Dr. Dahi further noted that "[u]nfortunately due to his severe cardiomyopathy, it is not safe for him to receive any stimulant medication (as per cardiologist's recommendation)." The result is that Combe's excessive sleepiness is only partially treated with scheduled naps, which do not control his symptoms, and "his sleepiness is likely to debilitate him."  (AR 563).  Dr. Dahi observed that Combe continues "to suffer from significant sleepiness despite adequate BiPAP therapy."  (AR 564).

Dr. Hatam's report on appeal references Dr. Dahi's treatment of Combe on 09/30/04, 11/22/04, and 01/05/05 as well as progress notes and Dr. Dahi's letter of 4/28/06.  She concludes, citing the sleep study conducted on 01/25/05, that Combe's obstructive sleep apnea is controlled with BiPAP pressure of 14/7.  AR 788-789.  The report generated Dr. Unsell regarding Combe's sleep apnea expressly defers "to the appropriate experts."  AR. 786. Person's letter denying Combe's Appeal makes no reference at all

to Combe's diagnosed sleep apnea or to a review of the recent
related medical records by an appropriate expert.

**Dr. Richard Roniger, psychiatrist:**

Dr. Roniger began treating Combe for depression in 1992.
His progress notes chronicle Combe's lengthy struggle with
depression and other psychiatric issues, which, according to Dr.
Roniger, deteriorated markedly in 2004.[12]  The following summary
of those reports and notes is taken from Dr. Randall Unsell's
Summary of Medical Information in the File, prepared during his
review of Combe's medical records, and dated September 28, 2006:

> Dr. Roniger's letter dated 4/6/06 reported
> that he initially saw the C, on 1/15/92 for
> major depression.  At that time he was given
> Prozac.  Medications given to date included
> Prozac, Norpramin, Zoloft, Desyrel, Pamelor,
> Wellbutrin, Paxil, Luvox, Ritalin, BuSpar,
> Conerta, and Adderall.  He wrote that the
> Cx's clinical response has varied over the
> years, and that the diagnosis of ADD was
> added in 1994.  *The stimulant treatment for
> the ADD was discontinued because of Cx's
> cardiac disease.  He also said that sleep
> apnea has complicated the problem, and that
> the combination of sleep apnea and the
> cardiac condition has worsened the Cx's
> chronic depressive disorder.*  Dr. Roniger
> reported that late in spring 2004, the Cx
> complained of reduced cognitive abilities,
> which have been chronic, but were worsening
> at the time.  The Cx found that he was
> failing to perform simple tasks, was late,

---

[12]Although Combe's Application did not even mention depression as a
factor in his disability, he did identify Dr. Roniger as one of his treating
physicians.  The administrator chose to base its denial of Combe's LTD benefit
claim largely on its determination that Dr. Roniger's diagnosis of "major
depression" was not supported by his 13 years of office notes regarding his
treatment of Combe.

and was missing things.  At this point in
time, the Cx was removed from his librarian
position and was back in a faculty position.
*There was gradual erosion of job performance.*
*His memory was spotty, concentration*
*decreased, and he was forgetting more*
*frequently.*  Medications were adjusted.  In
early summer, 2004, the sleep apnea persisted
and cognitive performance was variable.  He
had multiple somatic complaints.  He went on
leave of absence.  He was quite shut down
both mentally and physically.  He was
evaluated by a cardiologist in fall 2004, and
medications were given.  He had a cardiac
apparatus placed later in the year 2004.  In
March 2005, it was noted that the Cx was
taking better care of himself physically and
emotionally.  *In November 2005, it was noted*
*that he was having trouble sleeping, energy*
*was down, and he was not enjoying things.*
*Memory and concentration were impaired.*
Wellbutrin was increased.  *In early 2006,*
*fatigue persisted as well as impaired*
*concentration.  It was noted that his*
*condition was chronic, pervasive, and*
*deteriorating.*  He was last seen on 4/3/06,
and was taking Wellbutrin 250mg daily.  At
that time depression was ongoing, with
anhedonia, anergia, and poor sleep.  *He then*
*reported that the Cx's depression has*
*continued over these many years, and his*
*condition has been exacerbated by his cardiac*
*condition and sleep apnea.  He said the Cx*
*became unable to function as a law professor*
*in mid-2004.  He said that he would not*
*recommend that the Cx return to his former*
*job.  He said this would cause further*
*deterioration of his mental condition.*  He
said the Cx is able to function day to day
with the basic tasks of living.  He said that
he saw no reason to obtain psychological
testing, now or in the past.  He said the
diagnosis was quite evident to him.

AR 785 (emphasis supplied).  Dr. Unsell then issued the

following "<u>Medical Analysis</u>":

- .... The notes are not consistent with severe major depression signs and symptoms. *They do not show deficits in cognitive function testing, such as an abnormal mini-mental status examination. There has been no neuropsychological testing performed to substantiate cognitive deficits*.
- From the review of Dr. Roniger's office notes from 1992 forward, the Cx's psychiatric functional capacity before and after the incur date seems similar. Similar problems with focus, concentration, memory, energy, and mood have been noted for years.
- It is noted that the Cx has sleep apnea. This problem certainly causes sleep problems, and is also often associated with fatigue, and decreased concentration, attention, and memory. All these symptoms can also be associated with depression. From the information reviewed, it is not clear to what extent the sleep apnea caused these symptoms. Further comments about sleep apnea as well as other medical problems are deferred to the appropriate experts.

(AR 786). Again, relying on the *lack* of test results to support Dr. Roniger's notes and diagnosis, and crediting instead his own observation that Combe has exhibited "similar problems with focus, concentration, memory, energy, and mood" before and after the "incur" date (presumably 10/31/05, the administrator's choice as the date of the onset of Combe's disability), Dr. Unsell concluded that the "available information does not support a psychiatric functional impairment to preclude the claimant from work capacity." Id. He disregarded the treating physician's opinion, as well as his office notes and letter describing the deterioration of Combe's condition, based on Dr. Roniger's refusal to obtain neuropsychological testing to substantiate the referenced cognitive deficits and his diagnosis.

-34-

**Dr. Blackwell Evans, gatekeeper/general practitioner:**

Dr. Evans provided an APS dated 11/14/05, to which he attached medical records from Drs. Dahi, O'Meallie and McKinney. Combe had been seen by Dr. Evans since August 2000.  AR 040-041. His diagnoses included fatigue, sleep apnea, congestive heart failure, depression, cognitive dysfunction, and attention deficit disorder, with symptoms of fatigue, sleepiness, poor memory and concentration.  Dr. Dahi placed Combe's physical limitations at sedentary and deferred to "pertinent specialists", Drs. O'Meallie, Dahi and Roniger, for specific diagnoses and opinions. He stated that Combe was disabled as of September, 2004.

The Court finds that the factual background contained in the Administrative Record does not support the administrator's decision.  The administrator's decision is instead based on a *lack* of specific test results supporting the treating physicians' diagnoses.  See AR 111.  In <u>Salley v. Dupont</u>, the Plan administrator relied on the treating physician's opinion that the claimant was no longer suicidal to deny the claim, but ignored his collateral advice that in-patient hospitalization was still necessary because the claimant's stability would deteriorate if she was immediately released - a finding that could be verified by review of the hospital records from admissions that postdated DuPont's review.  The Fifth Circuit held that "[a]n administrator can abuse his discretion if he fails to obtain the necessary

information. .... the Plan administrators may rely on the
treating physician's advice, or it [sic] can independently
investigate the treatment's medical necessity.  .... The
administrators, however, cannot rely on part of [the treating
physician's] advice and ignore his other advice." Salley, 966
F.2d at 1015.

   In this case, CIGNA repeatedly selected a specific test
result or individual comment from each of the treating
physicians' office notes to support its denial of Combe's claim,
but ignored the bulk of the information that was available in the
Administrative Record from these same physicians.  It disregarded
their uncontroverted opinions and declarations that each
considered Combe to be disabled by his multiple medical
conditions.  The administrator appears to have been
inappropriately preoccupied with identifying a precise
symptomology or etiology to support a finding of disability as of
a particular date and from a specific, individual physical or
psychiatric condition.  The Lain court found such a determination
insufficient because it indicated "a complete absence in the
record of any 'concrete evidence'" supporting the administrator's
determination that the claimant was not disabled.  Lain, 279 F.3d
at 347.

4.   Inferences of lack of good faith.

   The Fifth Circuit has instructed that, like the degree of

-36-

deference accorded to the administrator's decision, the inference of a lack of good faith should be evaluated on a sliding scale. Wildbur, 974 F.2d at 638 ("'There may be in effect a sliding scale of judicial review of trustees' decisions .. . –more penetrating the greater is the suspicion of partiality, less penetrating the smaller that suspicion is ...'." Id., quoting Lowry v. Bankers Life & Casualty Retirement Plan, 871 F.2d 522, 525 n.6 (5th Cir.) cert denied, 110 S.Ct. 152 (1989)).  The "good faith" evaluation thus overlaps the determination of the level of deference due to the decision of the administrator in that the evidence of a lack of good faith reduces the level of deference accorded to the administrator's decision.

There was no specific incident or precipitous change in Combe's medical condition on any particular day that caused him to suddenly be unable to continue at his work.  The decline in his health and the worsening of various medical conditions and their interactions with one another is chronicled and thoroughly documented in the Administrative Record.  Yet the administrator repeatedly stated that it did not "understand what changed in [Combe's] condition as of 10/31/05 that prevents him from working".  CIGNA persisted in evaluating each individual medical or psychiatric condition as a separate issue from every other condition, and never considered the combined effect of all of Combe's combined medical and psychiatric conditions on his

ability to continue to perform the material tasks of his regular occupation.  Rather than putting the pieces of a puzzle together, CIGNA examined each piece individually, and finding it insufficient to support a finding of disability, put that piece aside and proceeded to examine the next piece, again finding that piece lacking.  The administrator then complained that it could not "understand" the whole picture that is the completed puzzle.

The medical records available to the administrator show that each of Combe's five treating physicians considered him to be disabled not by any single physical or psychiatric condition, by all medical conditions in concert with one another.  For example, treatment for the sleep apnea, ADD and depression was limited out of concern that it would exacerbate his serious cardiac condition, and the stress of living with his cardiac condition, sleep apnea and chronic fatigue, and of being unable to work at his job deepened his depression.  The Court finds that CIGNA's handling of Combe's claim was perfunctory and superficial, and not in good faith.

### *Conclusion*

In opposition to Combe's motion for summary judgment, CIGNA argues that summary judgment is not proper because there is an issue of material fact in dispute.  According to CIGNA, Combe's allegation that he is disabled under the Plan when CIGNA found insufficient evidence of his claimed disability is a disputed

issue of material fact.  It argues that the absence of neuropsychiatric testing to support Combe's claimed disability renders that claimed disability a disputed issue of fact.  The argument is not well taken.  Rather than identifying a genuine issue of material fact, CIGNA simply seeks to require a specific "fact" to determine Combe's disability - the results of the tests it demands.  CIGNA thus imposed a heightened burden on the claimant to prove his disability.  It has pointed to no provision in the plan, in the applicable statutes or regulations, or in jurisprudence requiring results of specific objective medical or neuropsychiatric testing as proof of the uncontroverted opinions of a claimant's treating physicians.  When Combe's treating psychiatrist, Dr. Roniger, wrote that he considered the testing requested by CIGNA to be unnecessary, CIGNA could have, but chose not to provide the requested testing, and did not request that he submit to examination by its own doctors.  See Gaither v. Aetna Life Ins. Co., 394 F.3d 792 (10th Cir. 2004); Salley v. DuPont, 966 F.2d 1011 (5th Cir. 1992).

A Third Circuit case Mitchell v. Eastman Kodack Company, 113 F.3d 433, (3rd Cir. 1997), is on point.  That Court held that the Plan's administrative denial of benefits based on lack of objective medical evidence means either that the claimant submitted insufficient medical evidence to persuade the Plan that he suffered from chronic and unpredictable fatigue and loss of

concentration, or that the claimant failed to submit clinical evidence establishing the etiology of the chronic and unpredictable fatigue and loss of concentration.  The Court held that the first interpretation was arbitrary and capricious since Kodak had no independent medical evidence to controvert the opinions of the claimant's physicians, and the second interpretation was arbitrary and capricious because it read into the Plan a requirement that the claimant not only prove that he was disabled, but also prove the clinical etiology of the disabling condition.  Id., at 442-443.  The Court finds the Third Circuit's reasoning to be persuasive.

CIGNA failed to provide the "full and fair review" of Combe's claim, and the Court finds that its decision was arbitrary and capricious, and an abuse of its discretion.  There are no genuine issues of material facts in dispute and Combe is entitled to summary judgment in his favor against CIGNA.  The Court finds that Combe's disability is the result of three medical conditions – heart disease, sleep apnea and major depression – in concert with one another.  The Court further finds that two of those conditions are physical – sleep apnea and heart disease – both of which exacerbated his depression, therefore, his disability is physical.

Under the terms of the Plan, Combe is entitled to monthly benefits in the amount of $6,389.21 per month from January 1,

2006 through September 30, 2010, plus contributions on his behalf to the Tulane University Pension Plan in the amount of $766.71 per month during the same period, plus legal interest from the date each installment became due until paid.  AR 210-211.  Combe is also entitled to reasonable attorney's fees, the amount to be determined at a later date, and costs incurred pursuing this litigation.

Accordingly,

**IT IS ORDERED** that David A. Combe's motion for summary judgment is **GRANTED;** and

**IT IS FURTHER ORDERED** that Life Insurance Company of North America d/b/a/ CIGNA Group Insurance's motion for summary judgment is **DENIED.**

New Orleans, Louisiana, June 21st 2007.

**MARCEL LIVAUDAIS, JR.**
Senior United States District Judge

-41-